UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| AMANDA TAYLOR, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | CAUSE NO.: 1:04-CV-445-TS |
| GTE NORTH INC., d/b/a VERIZON NORTH, INC., | ) ) ) ) | |
| Defendant. | ) ) | |

**OPINION AND ORDER**

This matter is before the Court on Defendant Verizon North, Inc.'s Motion for Summary Judgment [DE 30], filed on January 13, 2006. For the reasons stated herein, the Defendant's Motion is granted.

**BACKGROUND**

On November 23, 2004, the Plaintiff, Amanda Traylor, filed her Complaint against the Defendant for violations of her substantive rights under the Family Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq.*, when she was required to pay a portion of her health care premiums while on leave. She also alleged that her employer unlawfully retaliated against her in violation of the FMLA when it transferred her to a new position upon return from her leave.

On January 20, 2005, the Defendant answered. On March 16, 2005, the Plaintiff moved to amend her Complaint to assert that she was constructively discharged. On April 13, 2005, the Court granted the Plaintiff's motion and the Amended Complaint was filed. In the Amended Complaint, the Plaintiff alleged that she was forced to resign because of the hours she was required to work in her new position. The Defendant filed an Answer on June 1.

On January 13, 2006, the Defendant moved for summary judgment on all of the Plaintiff's claims. On February 23, the Plaintiff filed her response opposing summary judgment and on March 10, the Defendant replied.

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[S]ummary judgment is appropriate—in fact, is mandated—where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted). "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.'" *Abrams v. Walker*, 307 F.3d 650, 653 (7th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor

2

of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249–50; *Doe*, 42 F.3d at 443.

There is no separate rule of civil procedure governing summary judgment in employment discrimination cases. *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir. 1997) (noting, however, that issues of intent, such as in discrimination cases, are often critical issues that are genuinely contestable). Summary judgment in favor of the defendant is hardly unknown, or for that matter rare, in employment discrimination cases. *Id.*

## MATERIAL FACTS

The Plaintiff began her employment with the Defendant as a part-time Retail Sales Consultant in September 2002. She worked in Fort Wayne at a store known as the Phone Mart. Her duties included assisting customers in paying their bills and selling long distance packages and other features, such as caller I.D., call waiting, voice mail, and DSL. The Plaintiff was paid an hourly wage plus commission. This position was unionized and the Plaintiff was a member of the International Brotherhood of Electrical Workers (IBEW). The Plaintiff was the least senior of all the Retail Sales Consultants throughout her tenure in that position.

When the Plaintiff first began working at Verizon, her supervisor was Karen Richards. Richards determined and posted the work schedule of the Sales Consultants at the Phone Mart. The Plaintiff's typical schedule was an 11:00 a.m. to 7:00 p.m. shift or a 9:00 a.m. to 3:00 or 5:00 p.m.

shift. The Plaintiff never worked over forty hours because she was part-time. When Amy Johnson became the supervisor, she instituted the union approved bidding process, which required each employee to bid, in order of seniority, on the schedule they desired. Using this process, the Plaintiff was required to "close," or work until 6:30 p.m., about three days a week.

During summer 2003, the Defendant conducted an audit of the Plaintiff's sales. The Defendant was investigating allegations that the Plaintiff was ordering items and features for customers that they did not request and taking credit for these sales. The Defendant referred to this as "cramming." Richards's audit revealed that the Plaintiff had twenty-eight cramming instances, which was significantly higher than any other sales consultant. No other consultant had enough threshold occurrences to impose discipline. The Plaintiff denies any wrongdoing and maintains that there was only an audit because the Plaintiff would have been eligible for a trip to Las Vegas as the top seller, but Richards wanted a different employee to go on the trip.

A second audit was conducted in December 2003 or early January 2004. This audit was conducted by Johnson, who was the Plaintiff's supervisor at the time. Johnson involved William Crowley from Verizon's security department in this investigation, with both of them calling the Plaintiff's customers to confirm orders.

Also in January 2004, the Defendant's contribution for health care benefits changed. Under the IBEW's Collective Bargaining Agreement (CBA) with the Defendant, the Defendant was no longer providing 100% employer-paid health care coverage for part-time employees and would only pay 50% of premiums, effective January 1, 2004. In accordance with this change, the Plaintiff's first paycheck for 2004 reflected these deductions for health care coverage.

The Plaintiff took leave on January 21, 2004, due to complications in the early months of her

pregnancy. She remained on leave until April 5, 2004. After returning to work, Ted Rolfe, the Union representative, initiated a meeting with the Plaintiff by calling her and telling her he was coming to the Phone Mart. Rolfe and the Plaintiff met with Crowley and his assistant for over an hour. During this meeting, Crowley asked the Plaintiff questions about the cramming allegations. Crowley then brought Angela Manning, who was the Plaintiff's supervisor at the time, into the meeting. Manning requested that the Plaintiff turn over her badge and keys and clean out her locker. Rolfe and Manning escorted the Plaintiff to her car. The Plaintiff testified that she assumed, based on these actions, that she was terminated and she was not told otherwise at the time. The Defendant considered the Plaintiff to be on paid suspension and her paycheck indicated as such. The Plaintiff was informed shortly thereafter, through her union, that she was not fired, but was on paid suspension.[1]

At the end of the suspension, the Plaintiff was told that she would not be placed back in the Phone Mart because of the hostile environment there and the cramming.[2] The Defendant interviewed the Plaintiff for a Dispatch Clerk position and offered her that job. She began working in this position in May, 2004. The compensation scheme was different and less desirable to the Plaintiff because she could not earn commissions. The position, like her previous one, was a union position subject to the bidding process determined by seniority. The Plaintiff had the least seniority. The Plaintiff worked a 9:30 a.m. to 6:30 p.m. shift, including some weekends. This schedule did not suit the Plaintiff because of her child care situation and the fact that her husband worked until 8:00 p.m.

---

[1] Although the Plaintiff insists that she was terminated, whether the Defendant suspended the Plaintiff or terminated her and then converted it to a suspension is not material to the issues in this case.

[2] As will be discussed later in this Opinion, the Plaintiff believes that her supervisor and co-workers in the Phone Mart had engaged in harassing behavior. The Plaintiff has not asserted any claim in this Court that she was subject to a hostile work environment on the basis of her being in a protected class.

At first, the Plaintiff's mother was able to watch the Plaintiff's children after daycare. Later, the Plaintiff's mother got a job that precluded her from watching the Plaintiff's kids and the Plaintiff was unable to find alternative care.

The Plaintiff took a second leave in July after her son was born. She took around twenty-four weeks of leave between January 2004 and October 2004 due to her pregnancy and the birth of her child. On October 29, 2004, the Plaintiff resigned.

## DISCUSSION

### A.    FMLA Substantive Rights and Retaliation

The Plaintiff's claim that she was denied substantive rights overlaps with her retaliation claim. The Plaintiff contends that she was denied substantive rights under the FMLA when she was required to pay health care insurance premiums while on protected leave and when she was placed in a different position when she returned from leave. She argues that the Defendant's act of suspending her, which she believes was a termination that was converted into a suspension, and moving her to the Dispatch position was also an act of retaliation. The Defendant maintains that the Plaintiff did not receive less benefits while on leave than she received prior to her leave and that she was suspended and offered a non-sales position after its investigation revealed twenty-eight instances of cramming.

When an employee alleges a deprivation of a substantive right under the FMLA, she must demonstrate entitlement to the right by a preponderance of the evidence. *See Kohls v. Beverly Enters. Wis., Inc.*, 259 F.3d 799, 804 (7th Cir. 2001); *Rice v. Sunrise Express, Inc.*, 209 F.3d 1008, 1017 (7th Cir. 2000); *King v. Preferred Tech. Group*, 166 F.3d 887, 891 (7th Cir. 1999); *Diaz v.*

*Fort Wayne Foundry Corp.*, 131 F.3d 711, 713 (7th Cir. 1997). The substantive rights provided in the FMLA do not entitle an employee to "any right, benefit, or position of employment other than [that] to which the employee would have been entitled had the employee not taken leave." 29 U.S.C. § 2614(3); *Phelan v. City of Chicago*, 347 F.3d 679, 683 (7th Cir. 2003). "An employee is not afforded greater rights than he would otherwise have merely because he takes FMLA leave." *Phelan*, 347 F.3d at 683 (finding that employer did not violate FMLA when it made decision to terminate employee for poor performance while employee was on leave).

Thus, the pivotal question regarding the Plaintiff's benefits during leave is whether the decision to deduct premiums for health care was because she took leave or was without regard for her leave status. *See Kohls*, 259 F.3d at 804–05. The record reveals that the Plaintiff was not entitled to have the Defendant pay 100% of her premiums, irrespective of her FMLA leave. The Plaintiff admitted in her deposition that the requirement to pay 50% of health insurance premiums was a change pursuant to the terms of a CBA that took effect before her FMLA leave. The Plaintiff's first paycheck for 2004 reflected this change.

In her brief in opposition to summary judgment, the Plaintiff does not controvert these facts by citation to admissible evidence in the record. She does allege, for the first time, that she was denied insurance benefits (as opposed to required to pay premiums) and incurred thousands of dollars of out-of-pocket expenses for failure to receive benefits that all other employees received. (Resp. Brief at 7.) The Plaintiff cites to page 103 of her deposition in support of this statement. On that page, the Plaintiff indicates that she was required to pay for her own benefits and that this was not "fixed" for five months, while other employees got their premiums fixed in a week. The implication from this testimony is that there was a misunderstanding regarding health insurance

7

premiums that the Defendant remedied, or fixed, but did so less timely for the Plaintiff than for other employees. The Plaintiff testified that she was reimbursed for all premiums that she paid.

The Plaintiff's testimony does not create a material issue of fact. There is no indication that the Plaintiff's testimony regarding the timing of reimbursements was based on her personal knowledge of when other employees were reimbursed. *Unterreiner v. Volkswagen of Am., Inc.*, 8 F.3d 1206, 1211 (7th Cir. 1993) (stating that "the threshold criterion for any witness to testify in district court is that he 'has personal knowledge of the matter' about which he is testifying") (quoting Fed. R. Evid. 602)). Testimony that does not pass the threshold requirement of admissibility at trial is not sufficiently probative to create a genuine issue of material fact. *Id.* More importantly, this testimony does not even show that the Plaintiff was entitled to have all her premiums paid by the Defendant. It remains undisputed that the CBA provided that the Company's contribution would be 50%. The Plaintiff cites no evidence for her argument that the CBA was not binding.[3]

The Plaintiff also contends that she was entitled to be reinstated to the sales position she held prior to her leave. However, the right to reinstatement is not absolute. *Kohls*, 259 F.3d at 804.

> With no absolute right to reinstatement, whether an employer violates the FMLA turns on why the employee was not reinstated. Clearly, an employee may not be fired because she took leave—that would be in direct violation of the statute. *See* 29

---

[3] It also remains undisputed that the Plaintiff was reimbursed for the portion of premiums that she paid. The only explanation provided to the Court for this apparent contradiction is the Defendant's statement in a footnote to its brief that it reimbursed part-time employees for the portion of health care premiums that they paid when the Union argued that its agreement to the change in health care coverage for part-time employees was an oversight. The Defendant does not cite to anything in the record in support of this statement, but, as already indicated, the details of the reimbursement are not particularly important. The record is clear that the CBA provided for 50% payment of premiums for part-time employees and that the Plaintiff was a part-time employee. The Defendant deducted premiums from the Plaintiff's pay in accordance with the CBA before the Plaintiff took FMLA leave. There is nothing in the record to establish that the Plaintiff, or any other employee, was entitled to the reimbursements they received. Thus, even if the Court assumed that the Plaintiff was reimbursed later than other employees, this fact does not support her claim that she was denied a benefit to which she was entitled because she took FMLA leave.

> U.S.C. § 2615(a)(2). However, an employee may be fired for poor performance when she would have been fired for such performance even absent her leave. *See Clay v. City of Chicago Dep't. of Health*, 143 F.3d 1092, 1094 (7th Cir.1998).

*Id.* at 805. In addition to the substantive guarantees provided in the FMLA, such as reinstatement, the Act also affords employees protection if they are discriminated against for exercising these statutory rights. *King v. Preferred Tech. Group,* 166 F.3d 887, 891 (7th Cir.1999); 29 U.S.C. § 2617(a)(1) (making it "unlawful for an employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any [FMLA] right").

The Plaintiff contends that she has established a prima facie case of retaliation under the indirect method of proof. To establish a prima facie case, a plaintiff must show that after engaging in protected conduct only she, and not any similarly situated employee who did not engage in protected conduct, was subjected to an adverse employment action even though she was performing her job in a satisfactory manner. *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004) (FMLA retaliation case). Failure to satisfy any one element of the prima facie case dooms an employee's retaliation claim. *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 560 (7th Cir. 2004). If the defendant presents no evidence in response, the plaintiff is entitled to summary judgment. *Buie*, 366 F.3d at 503. If the defendant presents unrebutted evidence of a noninvidious reason for the adverse action, it is entitled to summary judgment. *Id.*

The Plaintiff contends that the Defendant terminated her employment, converted the termination into a suspension, and then only allowed her to return to work in the dispatch position, which resulted in constructive discharge. The Defendant maintains that the Plaintiff was suspended with pay and was not reinstated as a sales consultant after her suspension because of misconduct referred to as cramming. The Defendant submits that the Plaintiff cannot point to similarly situated

9

individuals who were treated better and that she was not performing her job satisfactorily. The Plaintiff argues that because she was a top seller and other sales consultants had also placed unauthorized services on a customer's plan, that the Defendant's discipline was not warranted.

Not only does the Plaintiff present no evidence in support of her allegation that no other employee was reprimanded, but her own deposition testimony indicates that no other employee had near the number of violations she did, much less a number that would justify discipline. The Plaintiff testified that Richards' investigation revealed that she had twenty-eight incidents, two other employees had one incident, one employee, Kelly, had four and another had zero. (Pf.'s Dep. at 155.) She stated that an employee was allowed fifteen before being marked. (*Id.*) She complained, "Kelly had 4 and nothing was happened [sic] to her, yet something happened to me." (*Id.*) Neither Kelly nor any other employee was similarly situated to the Plaintiff because their conduct was distinguishable on the basis of the number of violations. *See Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617–18 (7th Cir. 2000) (stating that to demonstrate a plaintiff is similarly situated normally includes a showing that the other employees engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them). The Plaintiff's own statement reveals that no other employee had the requisite threshold number of instances of fifteen to warrant discipline.

In an attempt to get around the obvious conclusion that the number of violations was a differentiating factor, the Plaintiff argues that it was "logical that she would have more discrepancies" because she did the most volume of sales. (Pf.'s Brief at 14.) Thus, the argument goes, as a percentage of sales her number was not bad. As proof that the Defendant did not think her conduct was egregious and was not the real reason for her suspension, she argues that if the

10

Defendant truly believed that she committed numerous frauds, it would not have waited until she returned from leave to address the problem with her but would have fired her outright. The record is not clear as to when the Defendant made the decision to discipline the Plaintiff. The Court is not aware if this decision was made prior to the Plaintiff's return on April 5, 2004, and just implemented after the meeting on that date, or whether the decision was made during the meeting. In *Kohls*, the court discussed timing:

> We can imagine circumstances in which the timing of this decision could lead a fact finder to infer that the employee would not have been fired absent her taking of leave (if, for example, a supervisor who had been aware of problems with an employee did not decide to fire the employee until she took leave, and the supervisor based the firing on the incidents of which the employer had already been aware).

259 F.3d at 806.

Here, the timing of the discipline does not allow such an inference. The allegations of cramming required investigation. The Plaintiff's supervisor found it appropriate to involve a member of the security department in the investigation. It is not clear what the investigation had yielded by the time the Plaintiff took leave, but it is undisputed that the investigation was underway before the Plaintiff's leave. Thus, this is not a situation where an employer has full knowledge of an employee's misconduct before she takes leave, but does not find it worthy of discipline until after the plaintiff decides to take leave. Nor is it a situation where an employer has knowledge of allegations of misconduct, but does not decide to investigate until after the plaintiff announces a need to take leave. Here, if taking leave were the triggering or motivating event, as the Plaintiff claims, the Defendant could have acted in January, soon after the Plaintiff took leave. Instead, the evidence is that when the Plaintiff returned to work in April, the Defendant questioned her with her union representative present. Because this was the first time that the Defendant spoke to the Plaintiff

11

about its findings, it was reasonable for the Defendant to wait to take action until the Plaintiff had an opportunity to address and defend the allegations and findings.[4] It was also reasonable to wait because the Plaintiff would not have felt the effects of a suspension when she was already gone from work and because there was no danger that the Plaintiff would have contact with customers while on leave.[5]

The Plaintiff argues in her brief that she was not given an explanation as to why she could not return to the Phone Mart. In her deposition, however, she testified that she was told that putting her back in the Phone Mart would send a message to the other sellers that it was okay to engage in cramming. (Pf.'s Dep. at 89.) She testified that her union representative informed her that the Defendant was not willing to put her back in the Phone Mart because of the "hostile working environment" and "because of the cramming." (Pf.'s Dep. at 90.)

The Plaintiff has not made a showing sufficient to establish the existence of an element essential to her case, and on which she will bear the burden of proof at trial. The Plaintiff has not established that the Defendant would not have suspended her and refused to allow her to work in sales at the Phone Mart had she not taken FMLA leave. Rather, requiring the Defendant to pay 100% of insurance premiums and to allow the Plaintiff to remain in her sales position despite its findings that she engaged in cramming would have conferred a benefit and a position of employment that she would not have been entitled to if she had never left the workplace.

---

[4] The Plaintiff argues in her brief that she was aware that her customers were being contacted about her services in January 2004, before she went on leave, but she was not confronted or told about the investigation, or given the opportunity to address the issues, before taking leave.

[5] The Court also finds it worthy of note that the Plaintiff was awarded an additional twelve weeks of leave in June when her baby was born. The Plaintiff is not alleging any adverse action by the Defendant as a result of this leave. This belies the Plaintiff's argument that it was her leave, and not the cramming, that motivated the Defendant to suspend her and move her from a sales position.

12

**B.     Constructive Discharge**

The Plaintiff's claim that she was forced to resign was but one element (the adverse employment action element) of her failed retaliation claim and the Court need not address it separately here. *See Sweeney v. West*, 149 F.3d 550, 558 (7th Cir. 1998) (holding that an employee is only constructively discharged if the underlying working conditions were themselves unlawful (i.e., discriminatory in some fashion)). The Plaintiff has made no claim that her hours of work in the dispatch job itself were determined on a discriminatory basis, but acknowledged that they were determined by a bidding process. Because the transfer to Dispatch did not deny the Plaintiff substantive FMLA rights and was not the result of unlawful retaliation, it is of no legal consequence that she felt forced to resign because of the schedule.

**C.     Miscellaneous Allegations**

The Plaintiff alleges in her brief opposing summary judgment that she was subjected to harassment by her supervisor and co-workers in the Phone Mart prior to her leave. The Plaintiff also alleges that she was called various names by employees in the dispatch position. Because these claims do not relate to her FMLA claim and because they are not supported by citations to the record, their consideration is not a part of the Court's ruling on summary judgment. *See* N.D. Ind. L.R. 56.1(a) (providing that response to summary judgment motion must set forth facts, with appropriate citations to admissible evidence, to which the responding party contends there exists a genuine issue to be litigated); *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921–22 (7th Cir. 1994) ("We have endorsed the exacting obligation these [local] rules impose on a party contesting summary judgment to highlight which factual averments are in conflict as well as what record

13

evidence there is to confirm the dispute, explaining that district courts are not obliged in our adversary system to scour the record looking for factual disputes and may adopt local rules reasonably designed to streamline the resolution of summary judgment motions.").

## CONCLUSION AND ORDER

For the foregoing reasons, the Defendant's Motion for Summary Judgment [DE 30] is GRANTED. Judgment will be entered in favor of Verizon North, Inc., and against Amanda Traylor.

SO ORDERED on April 12, 2006.

                                        s/ Theresa L. Springmann
                                        THERESA L. SPRINGMANN
                                        UNITED STATES DISTRICT COURT